IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| CAL CREATIONS, LLC,<br><br>      Plaintiff,<br><br>vs.<br><br>WILLIAM BARBATO and ANGELA BARBATO,<br><br>      Defendants,<br><br>and<br><br>WILLIAM BARBATO,<br><br>      Counterclaimant and Third-Party Plaintiff,<br><br>vs.<br><br>CAL CREATIONS, LLC,<br><br>      Counterclaim Defendant,<br><br>and<br><br>CHRISTOPHER A. LEACH,<br><br>      Third-Party Defendant. | **8:25CV3118**<br><br><br>**MEMORANDUM AND ORDER ON DEFENDANT ANGELA BARBATO'S MOTION TO DISMISS AND COUNTERCLAIM DEFENDANT'S AND THIRD-PARTY DEFENDANT'S MOTION FOR PARTIAL DISMISSAL OF DEFENDANT WILLIAM BARBATO'S COUNTERCLAIMS AND THIRD-PARTY CLAIMS** |

In this action removed from state court, plaintiff Cal Creations, LLC, (Cal) seeks to recover payment in excess of $500,000 that it is allegedly owed or will be owed for redesign and remanufacture of a 1933 Pontiac Sedan allegedly owned by defendant spouses William and Angela Barbato. Filing 1-1. Angela Barbato (Angela) filed a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction on the ground that she is not an owner of the Pontiac Sedan and had no involvement in the events described in Cal's Complaint. Filing 4;

1

Filing 7 at 3. William Barbato (William) filed an Answer, Counterclaim, and Third-Party Complaint, denying Cal's claims and asserting various claims against Cal and Christopher A. Leach, a third-party defendant who purportedly owns Cal, to recover over $1.5 million in losses from an alleged scheme by Cal and Leach. Filing 8; Filing 31 at 2. Cal and Leach responded with a "Partial Motion to Dismiss" [sic] also now before the Court seeking the dismissal of William's second through fifth claims for relief. Filing 27. For the reasons stated below, Angela's Motion to Dismiss is granted, and all claims against her are dismissed for lack of personal jurisdiction. For the reasons stated below, Cal's and Leach's Motion for Partial Dismissal of William's Counterclaim and Third-Party Complaint is granted, and William's second, third, and fourth causes of action are dismissed in their entirety, and his fifth cause of action is dismissed as to Leach.

## I.   INTRODUCTION

There is ultimately little overlap in the dispositive facts relevant to the two motions now before the Court. Thus, the Court sets out here only the common factual context of the litigation drawn primarily from Cal's Complaint. The Court will set out additional facts specifically relevant to each motion in its discussion of each motion. However, the Court will set out only one summary of the procedural background.

### A.  Factual Context

Plaintiff Cal Creations, LLC, (Cal) is a Nebraska limited liability company doing business in Bennington, Douglas County, Nebraska. Filing 1-1 at 2 (¶ 1). Cal is a business that designs and remanufactures vintage and/or classic cars. Filing 1-1 at 2 (¶ 4). Third-party defendant Christopher A. Leach is identified in the Third-Party Complaint only as a resident of Douglas County, Nebraska. Filing 8 at 5 (¶ 3). However, the Barbatos assert in their Notice of Removal that "[u]pon information and belief, Christopher A. Leach is the only member of Cal Creations." Filing 1 at 2

(¶ 5). William similarly identifies Leach in his brief in opposition to the motion to dismiss his counterclaims and third-party claims as "the owner of Cal Creations." Filing 31 at 2.

Defendants William Barbato and Angela Barbato are residents of Chester, New Jersey. Filing 1-1 at 2 (¶ 2). Cal alleges that the Barbatos are the owners and have full title of a 1933 Pontiac Sedan (VIN # unknown). Filing 1-1 at 2 (¶ 5). The Barbatos delivered the 1933 Pontiac Sedan to Cal in approximately 2016, for redesign and remanufacturing, with the intent that the car would be entered into car show competitions. Filing 1-1 at 2 (¶ 6).

There appears to be no dispute that Cal conducted significant design and remanufacturing work on the 1933 Pontiac Sedan. Filing 1-1 at 2 (¶ 6). There also appears to be no dispute that the 1933 Pontiac Sedan was entered into a national car show competition and won the 2025 Al Slonaker Memorial Award for the best non-roadster vehicle at the show. Filing 1-1 at 3 (¶ 9). However, the parties dispute whether the Barbatos have failed to make full payment on various invoices pertaining to work by Cal, its employees, and its contractors on the 1933 Pontiac Sedan. Filing 1-1 at 3 (¶ 12). There is also a dispute over William's allegations that Cal and Leach engaged in an ongoing scheme over several years to keep representing to William that the Pontiac was near completion and would be promptly completed if William paid Cal more money, resulting in well over $1.5 million in losses to William. Filing 8 at 6 (¶ 12).

**B. Procedural Background**

Cal filed its Complaint in this action in the District Court of Douglas County, Nebraska, on April 18, 2025. Filing 1-1. Although Cal does not set out its claims in separate counts, Cal appears to assert breach of a verbal contract and/or an implied contract to pay for the services that Cal has rendered on the 1933 Pontiac Sedan, unjust enrichment of the Barbatos by the redesign and remanufacturing of the 1933 Pontiac Sedan for which the Barbatos have not paid in full, and quantum meruit. Filing 1-1 at 4 (¶¶ 22–24). Cal seeks damages "in the amount of at least

3

$543,436.13, which continue to increase on a daily basis, attorney fees, pre-judgment interest, post judgment interests, Plaintiff's costs expended, and for such other relief as the Court may deem just and equitable." Filing 1-1 at 4 (Wherefore clause).

The Barbatos removed this action to this Court on May 23, 2025, based on diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(1). Filing 1 at 1 (¶ 2). Thereafter, their defenses took different directions. On May 27, 2025, Angela filed the Motion to Dismiss now before the Court pursuant to Federal Rule of Civil Procedure 12(b)(2), asserting lack of personal jurisdiction. Filing 4. On the other hand, William filed his Answer, Counterclaim, and Third-Party Complaint on May 30, 2025, denying Cal's claims, asserting various affirmative defenses, and asserting counterclaims and third-party claims against Cal and Leach. Filing 8 at 5–12. More specifically, William asserts claims for conversion (First Claim for Relief); fraud and concealment (Second Claim for Relief); violation of the Nebraska Consumer Protection Act (NCPA) (Third Claim for Relief); estoppel (Fourth Claim for Relief); and unjust enrichment (Fifth Claim for Relief). Filing 8 at 7–11.

In response to William's Counterclaim and Third-Party Claim, Cal and Leach filed a "Partial Motion to Dismiss" [sic] pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state claims upon which relief can be granted. Filing 27. Cal and Leach do not challenge William's conversion claim in his First Claim for Relief, but they do challenge his Second through Fourth Claims for Relief as to both Cal and Leach and his Fifth Claim for Relief as to Leach. Filing 27 at 1.

The Motions to Dismiss are now fully submitted. As mentioned above, there is ultimately little overlap in the dispositive facts relevant to the two motions. Moreover, the two Motions are subject to different standards. Therefore, the Court will consider them separately.

## II.  THE MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

Angela's Motion to Dismiss for lack of personal jurisdiction, Filing 4, involves primarily facts beyond those alleged in Cal's Complaint. *See Fastpath, Inc. v. Arbela Techs. Corp.*, 760 F.3d 816, 820 (8th Cir. 2014) (explaining that on a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), the facts are drawn "not [from] the pleadings alone, but [also from] affidavits and exhibits supporting or opposing the motion."). Thus, the Court begins with a summary of those additional factual allegations.

### A.  Additional Factual Background

In a Declaration in support of her Motion to Dismiss, Angela declares that she has resided full-time in New Jersey since 1943 and has never resided in or owned real property in Nebraska. Filing 5-1 at 1 (¶¶ 6–7). Indeed, she declares that she has not been to Nebraska since 2016, but that visit was not for any business purpose. Filing 5-1 at 1 (¶ 8).

Angela declares further that she has never actively sought contact with any Nebraska individual or entity; has never traveled to Nebraska to negotiate any transaction or deal with Cal; and was not involved in or a party to any transactions, deals, or discussions with Cal. Filing 5-1 at 1 (¶¶ 9–11). She specifically declares that she has never entered into any agreement or contracts with Cal and has never asked Cal to perform any services on her behalf. Filing 5-1 at 2 (¶ 12). She declares that she does not own and is not listed on the title to the 1933 Pontiac vehicle discussed in Cal's Complaint, nor has she delivered any payments to Cal in Nebraska. Filing 5-1 2 (¶¶ 13, 16). Finally, Angela declares that she has never consented to the jurisdiction of Nebraska courts and has not been served with process in the State of Nebraska. Filing 5-1 at 2 (¶¶ 14–15).

In a Declaration in Opposition to Angela's Motion to Dismiss, Leach declares that Angela has been named in numerous articles and social media posts as an owner of the 1933 Pontiac

Sedan. Filing 14-1 at 1 (¶ 3) (citing Filing 14-2 through Filing 14-5). Leach also declares that William instructed Cal "to name Angela as the owner of the vehicle and put her on all publications." Filing 14-1 at 2 (¶ 4) (citing Filing 14-6). Leach declares further that Angela is shown in a photograph receiving the 2025 Al Slonaker Memorial Award for the 1933 Pontiac Sedan. Filing 14-1 at 2 (¶ 5) (citing Filing 14-7). Finally, Leach declares, "I am aware that Angela Barbato did pay invoices related to the 1933 Pontiac Sedan and have attached a February 8, 2025 text message between myself and Bill Barbato wherein he was going to sit with his wife about paying an invoice." Filing 14-1 at 2 (¶ 6) (citing Filing 14-8).

Returning to allegations in its Complaint, Cal reiterates the following in opposition to Angela's Motion to Dismiss:

> The Barbato's [sic], including Angela, requested work be conducted on the 1933 Pontiac Sedan by Cal Creations, LLC in Nebraska. (Doc 1 Complaint ¶ 10) The Barbato's [sic] accepted the work conducted by Cal Creations, in Nebraska, and benefited by being named winners of the 2025 Slonaker Memorial Award (Doc. 1 Complaint ¶ 8-9). Plaintiff asserts there are unpaid invoices related to the work and Defendants, including Angela, have failed to pay said invoices. (Doc. 1 Complaint ¶ 12-13).

Filing 15 at 5.

## B.  The Parties' Arguments

In support of her Motion, Angela argues that Nebraska courts lack either "general" or "specific" jurisdiction over her. Filing 7 at 3.[1] Apparently in reference to general personal jurisdiction, Angela reiterates ¶¶ 6–9 of her Declaration. Filing 7 at 3 (citing Filing 5-1 at 1 (¶¶ 6–9)). She argues that she has no affiliations with or to Nebraska, let alone any continuous or systematic connections. Filing 7 at 3. She contends that forcing her to defend a lawsuit in Nebraska

---

[1] To be precise, Angela argues, "Both specific and personal jurisdiction are lacking over Angela." Filing 7 at 3. This statement appears to be a scrivener's error because as discussed in detail below the two kinds of personal jurisdiction are "general" and "specific." *See, e.g., Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 12 (2025).

would consequently violate her due process rights and conflict with Nebraska's long-arm statute, Neb. Rev. Stat. § 25-536. Filing 7 at 3.

As to specific personal jurisdiction, Angela reiterates ¶¶ 10–13 and 16 of her Declaration. Filing 7 at 3 (citing Filing 5-1 at 1–2 (¶¶ 10–13, 16)). She contends that Cal's vague references to "Defendants" in the Complaint do not overcome the lack of evidence of her involvement in the events described in the Complaint or any dealings with Cal. Filing 7 at 3. In short, she argues that Cal's claim against her could not have arisen out of any activities that she directed at Nebraska when there are no such activities. Filing 7 at 3. She declares that she is a stranger to the events giving rise to the Complaint, so that dismissal of the Complaint against her for lack of personal jurisdiction is warranted. Filing 7 at 3.

In response, Cal relies first on its allegations in its Complaint as demonstrating that both Angela and William are owners of the 1933 Pontiac Sedan. Filing 15 at 4 (citing Filing 1-1 at 2 (¶ 5)); Filing 15 at 5 (citing Filing 1-1 at 5 (¶¶ 8–10, 12–13)). Cal also relies on the allegations in Leach's Declaration and the documents cited in it. Filing 15 at 4–5 (citing Filing 14-1 at 1–2 (¶¶ 3–5)). Based on these allegations, Cal argues that Angela should reasonably have anticipated being sued in Nebraska for failing to pay invoices. Filing 15 at 5.

Cal also asserts that Angela made payments to Cal for work conducted on the 1933 Pontiac Sedan. Filing 15 at 5 (citing Filing 14-1 at 2 (¶ 6), in turn citing Filing 14-8). Thus, Cal asserts that Angela was aware of the work being conducted in Nebraska and made payments to Cal, which means that she was transacting business in Nebraska and is subject to personal jurisdiction in Nebraska pursuant to Neb. Rev. Stat. § 25-536. Filing 15 at 5. In short, Cal asserts that it has shown that Angela has sufficient contacts with Nebraska to provide personal jurisdiction over her. Filing 15 at 5.

Angela's reply challenges Cal's arguments on evidentiary grounds:

> Plaintiff has presented nothing showing Angela purposely availed herself to Nebraska. Plaintiff has no evidence (and has not even alleged) Angela was in Nebraska for anything to do with the claims at issue, communicated with Plaintiff, or contracted with Plaintiff. Plaintiff's assertions that Angela owned the vehicle lack foundation, are premised entirely upon inadmissible hearsay, and do not establish purposeful availment to Nebraska nonetheless.
>
> Finally, Plaintiff's assertions of a purported payment from Angela through hearsay and speculation is unavailing. Plaintiff has not produced any check, invoice, or related communication from Angela showing or promising any payment. Plaintiff is also being disingenuous because the invoice serving as the basis for its claim, and all invoices prior, were directed solely to "Bill Barbato" in New Jersey. (Doc. 16-1, Pg. 3).

Filing 18 at 1.

### C. The Court Lacks Personal Jurisdiction Over Angela

*1. Applicable Standards[2]*

The Eighth Circuit Court of Appeals has explained, "To survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must plead sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Creative Calling Sols., Inc. v. LF Beauty Ltd.*, 799 F.3d 975, 979 (8th Cir. 2015) (internal quotation marks and alteration omitted). A plaintiff bears "the burden of establishing a prima facie showing of jurisdiction." *Whaley v. Esebag*, 946 F.3d 447, 451 (8th Cir. 2020). "A prima facie showing is accomplished by pleading sufficient facts to support a reasonable inference that the defendant can be subjected to jurisdiction within the state." *Bros. & Sisters in Christ, LLC v. Zazzle, Inc.*, 42 F.4th 948, 951 (8th

---

[2] Although Cal does not argue that Angela has waived her attack on personal jurisdiction, the Court notes that "personal jurisdiction is a *personal* defense that may be waived or forfeited." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 144 (2023) (emphasis in the original). However, the Barbatos' removal of this case to federal court, "in itself, does not constitute a waiver of any right to object to lack of personal jurisdiction." *Nationwide Eng'g & Control Sys., Inc. v. Thomas*, 837 F.2d 345, 347–48 (8th Cir. 1988). There is no waiver of Angela's challenge to personal jurisdiction where Angela's only filing in the case after removal was her motion to dismiss for lack of personal jurisdiction, so she cannot be deemed to have entered a general appearance. *Cf. Norsyn, Inc. v. Desai*, 351 F.3d 825, 828 (8th Cir. 2003) (finding no waiver and no general appearance where the defendant had not filed anything after removal).

Cir. 2022) (internal quotation marks omitted). "The evidentiary showing required at the prima facie stage is minimal." *Bros. & Sisters in Christ, LLC*, 42 F.4th at 951. However, this "prima facie showing must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *Fastpath*, 760 F.3d at 820 (internal quotation marks omitted). Here, both Cal and Angela properly submitted affidavits and exhibits outside of the Complaint in support of and opposition to Angela's Motion to Dismiss.

"Once [personal] jurisdiction has been controverted or denied, (the plaintiff) has the burden of proving such facts." *Aaron Ferer & Sons Co. v. Diversified Metals Corp.*, 564 F.2d 1211, 1215 (8th Cir. 1977) (citing *Block Indus. v. D.H.J. Indus., Inc.*, 495 F.2d 256, 259 (8th Cir. 1974)). Courts in this District have understood this requirement to mean that "the plaintiff has the burden of submitting admissible evidence to support personal jurisdiction over [a] defendant[ ], and cannot rely on the bare pleadings alone." *Zapata v. Boldt Co.*, No. 4:07CV3179, 2007 WL 2994652, at *1 (D. Neb. Oct. 11, 2007); *see also Taylor v. Wescom Credit Union*, No. 8:07CV127, 2008 WL 4772558, at *1 (D. Neb. Oct. 24, 2008) (also citing *Aaron Ferer & Sons*, 564 F.2d at 1215, for this proposition); *Rivera v. Medico Grp.*, No. 4:07CV3180, 2007 WL 4208817, at *3 (D. Neb. Nov. 19, 2007) (also citing *Aaron Ferer & Sons*, 564 F.2d at 1215, for this proposition).

The first question on a motion to dismiss for lack of personal jurisdiction ordinarily is whether the "long-arm statute" of the forum state allows for the exercise of personal jurisdiction over the challenging party. *Kaliannan v. Liang*, 2 F.4th 727, 733 (8th Cir. 2021) (internal quotation marks omitted), *cert. denied*, 142 S. Ct. 758 (2022). However, Nebraska's long-arm statute, Neb. Rev. Stat. § 25–536, permits jurisdiction to the maximum extent allowed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *See Hand Cut Steaks Acquisitions, Inc. v. Lone Star Steakhouse & Saloon of Nebraska, Inc.*, 723, 905 N.W.2d 644, 661

9

(Neb. 2018); *Pecoraro v. Sky Ranch for Boys, Inc.*, 340 F.3d 558, 561 (8th Cir. 2003). Thus, "the traditional due process analysis is dispositive" in this case. *Kaliannan*, 2 F.4th at 733.

The Supreme Court recently reiterated that the requirement of personal jurisdiction "flows . . . from the Due Process Clause." *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 11 (2025) (quoting *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)) (also reiterating that "[a]ny difference between the Fifth and Fourteenth Amendments is therefore implicated in only a subset of federal cases, such as those in which personal jurisdiction is . . . 'authorized by a federal statute.'" (citing Fed. Rule Civ. Proc. 4(k)(1)(C))). "Due process requires that the defendant purposefully establish 'minimum contacts' in the forum state such that asserting personal jurisdiction and maintaining the lawsuit against the defendant does not offend traditional conceptions of fair play and substantial justice." *Hawkeye Gold, LLC v. China Nat'l Materials Indus. Imp. & Exp. Corp.*, 89 F.4th 1023, 1032 (8th Cir. 2023) (quoting *K-V Pharm. Co. v. J. Uriach & CIA, S.A.*, 648 F.3d 588, 592 (8th Cir. 2011)), *cert. denied*, 144 S. Ct. 2605 (2024).

Since *International Shoe Company v. Washington*, 326 U.S. 310 (1945), the Supreme Court's decisions have recognized two types of personal jurisdiction that satisfy due process: "general jurisdiction" and "specific jurisdiction." *Fuld*, 606 U.S. at 12; *Hawkeye Gold, LLC*, 89 F.4th at 1032 (explaining that "personal jurisdiction may be established by general jurisdiction . . . or by specific jurisdiction. . . ."); *Bros & Sisters in Christ, LLC*, 42 F.4th at 951–52 (explaining that "[t]he relevant conduct and connections for the due process analysis depend on whether personal jurisdiction is alleged to be general or specific." (citing *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021))). The Supreme Court explained,

> General jurisdiction lies in the forum where the defendant is domiciled or fairly regarded as at home. A court in such a forum may hear any claim against that defendant, even if all the incidents underlying the claim occurred in a different State. . . .

*Fuld*, 606 U.S. at 12 (cleaned up with citations omitted); *see also Wade v. Pottawattamie Cnty.*, 100 F.4th 991, 993 (8th Cir. 2024) (explaining the requirements of general personal jurisdiction). In other words, general jurisdiction is available when the defendant is "essentially at home" in the forum. *Wade*, 100 F.4th at 993 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). General jurisdiction is available "only when there are 'continuous and systematic' contacts." *Id.* (quoting *Goodyear Dunlop Tires*, 564 U.S. at 919). It is not available where the contacts are only "random [and] fortuitous." *Id.* (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).

The Supreme Court has explained that "[s]pecific jurisdiction is different." *Fuld*, 606 U.S. at 12. It explained,

> Specific jurisdiction . . . covers defendants less intimately connected with a State, but only as to a narrower class of claims. A state court may exercise specific jurisdiction over a nonresident defendant only so long as there exist "minimum contacts" between the defendant and the forum State. The requisite contacts for this kind of jurisdiction often go by the name "purposeful availment." The defendant, we have said, must take some act by which it purposefully avails itself of the privilege of conducting activities within the forum State. And the plaintiff's claims, we have held, must derive from, or be connected with, those activities.

*Fuld*, 606 U.S. at 12–13 (cleaned up with citations omitted); *see also Wade*, 100 F.4th at 993 (explaining that specific jurisdiction "covers only those claims 'aris[ing] out of or relat[ing] to [a party's] contacts with the forum.'" (quoting *Ford Motor Co.*, 592 U.S. at 359)). As with general jurisdiction, "the contacts must be more than random and fortuitous, but they need not rise to the level of continuous and systematic." *Wade*, 100 F.4th at 993.

The Eighth Circuit has explained that in the due process analysis of personal jurisdiction, "[w]e analyze five factors and the totality of the circumstances in assessing minimum contacts: "(1) the nature and quality of [defendant's] contacts with the forum state; (2) the quantity of such contacts; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in

11

providing a forum for its residents; and (5) convenience of the parties." *Hawkeye Gold, LLC*, 89 F.4th at 1032 (quoting *Kaliannan*, 2 F.4th at 733).[3] Not only are the first three factors "primary" and "carry more weight," but the third of the five due process factors addresses specific personal jurisdiction, because it "requires that the cause of action arise from or relate to a defendant's actions within the forum state." *Id.* (citing *Wells Dairy, Inc. v. Food Movers Int'l, Inc.*, 607 F.3d 515, 518 (8th Cir. 2010)); *Whaley*, 946 F.3d at 452 (explaining that "[t]he third factor speaks to the particular question of specific jurisdiction.").

### 2. Angela Has Insufficient Contacts with Nebraska to Satisfy Due Process

Cal acknowledges the two types of personal jurisdiction that satisfy due process as general and specific. Filing 15 at 3; *see Fuld*, 606 U.S. at 12 (explaining that the Supreme Court had recognized the two types of personal jurisdiction that satisfy due process). However, Cal never plainly states which type of personal jurisdiction it believes this Court has over Angela. Filing 15 *passim*. Under these circumstances, the Court would need to consider only specific personal jurisdiction because if sufficient contacts for specific jurisdiction are lacking, then sufficient contacts for general jurisdiction are also necessarily lacking. *See Hawkeye Gold, LLC*, 89 F.4th at 1032 (explaining that of the five factors for determining whether there are sufficient minimum contacts for specific or general jurisdiction to satisfy due process the third factor relates to specific jurisdiction). Nevertheless, the Court will consider whether it has either type of personal jurisdiction over Angela.

---

[3] The Eighth Circuit has also stated that the five factors are used "[i]n determining whether specific jurisdiction exists," not in determining whether either general or specific jurisdiction exists. *Bros. & Sisters in Christ, LLC*, 42 F.4th at 952. However, the Eighth Circuit then explained that in the context of specific jurisdiction, the first three factors are of "primary importance" while the "fourth and fifth factors carry less weight." *Id.* (quoting *Whaley*, 946 F.3d at 452).

a.  Cal's Evidence of Alleged Contacts Is Inadmissible

Before the Court considers Angela's alleged contacts with Nebraska, the Court must consider Angela's challenge in her Reply, Filing 18, to the sufficiency of Cal's evidence of alleged contacts identified in Cal's Opposition, Filing 15, and set out in Cal's supporting Index of Evidence, Filing 14. Angela argues, "Plaintiff's assertions that Angela owned the vehicle lack foundation [and] are premised entirely upon inadmissible hearsay." Filing 18 at 1. Similarly, she argues that Cal's assertions that she made payments for Cal's work on the vehicle are supported only by "hearsay and speculation." Filing 18 at 1.

The Court must address these arguments first because Cal's *prima facie* showing of personal jurisdiction "must be tested, not by the pleadings alone, but by affidavits and exhibits supporting or opposing the motion." *Fastpath*, 760 F.3d at 820 (internal quotation marks omitted). Thus, once personal jurisdiction has been denied—as Angela has done here—Cal has the burden of submitting admissible evidence to support personal jurisdiction over her and cannot simply rely on its bare pleadings. *Aaron Ferer & Sons Co*., 564 F.2d at 1215 (8th Cir. 1977) (citing *Block Indus*., 495 F.2d at 259); *see also Taylor*, 2008 WL 4772558, at *1; *Rivera*, 2007 WL 4208817, at *3; *Zapata*, 2007 WL 2994652, at *1.

Cal relies on allegations in Leach's Declaration and the documents cited in it to support its contention that Angela was an owner of the 1933 Pontiac Sedan. Filing 15 at 4–5 (citing Filing 14-1 at 1–2 (¶¶ 3–5)). However, as Angela argues, the allegations lack foundation and amount to nothing more than inadmissible hearsay and speculation. The February 2, 2025, article entitled "1933 Pontiac Wins the Slonaker Award at Grand Nations Roadster Show" by John McGann from a publication identified only as HR Newsletter states, "Andy Leach and Cal Auto Creations built this car for owners Bill and Angela Barbato," then later again refers to "owners Bill and Angela Barbato. . . ." Filing 14-2 at 1–2, 6. Similarly, a Modern Rodding Online article entitled "Hot Rods

and History Unite: The 75th Grand National Roadster Show Earned its Moniker: The Grand Daddy of Them All" by Brian Brennan states, "Taking home the Slonaker honors was the stunning 1933 Pontiac sedan belonging to Bill and Angela Barbato," then later captions a photograph as showing the trophy "awarded to Bill and Angela Barbato's 1933 Pontiac sedan." Filing 14-3 at 3, 9. A January 30, 2025, Facebook post by Auto Builder, by an unidentified author, states, "[W]e're excited to debut 'Aurabella,' a stunning 1933 Pontiac Sedan owned by Bill & Angela Barbato, at the 75th Annual Grand National Roadster Show!" Filing 14-4 at 1. A February 4, 2025, article entitled "Bill Barbato's 1933 Pontiac Sedan is 2025 Al Slonaker Memorial Award Winner" by Brandan Gillogly apparently from Car Profiles refers to "Bill and Angela Barbato's sleek and polished 1933 Pontiac sedan." Filing 14-5 at 2. There is no showing that any of the authors of these articles had any firsthand knowledge of the legal ownership of the 1933 Pontiac Sedan. None of them even purport to quote either William or Angela as stating that one or both of them owns the vehicle. Thus, the statements lack foundation, are hearsay, and are based on nothing more than speculation, making them inadmissible. Fed. R. Evid. 602, 802.

Also, a photograph of William and Angela purportedly receiving the 2025 Al Slonaker Memorial Award for the 1933 Pontiac Sedan has little—if any—probative value as to the ownership of the vehicle. Filing 14-7. The photograph bears no caption and only speculation suggest that both William and Angela are owners of the vehicle simply because they are pictured together with the vehicle. Either spouse who had sole title to the vehicle would quite reasonably want the other spouse to join him or her in receiving an award. Thus, the probative value—if any—of this photograph on the issue of the ownership of the vehicle is outweighed by both its lack of foundation and its potential for confusing or misleading the jury. Fed. R. Evid. 403. Cal also relies on William's rambling and barely comprehensible response to a text message apparently from

14

someone at Cal to assert that Cal "was instructed by William Barbato to name Angela as the owner of the vehicle and put her on all publications." Filing 14-1 at 2 (¶ 4) (citing Filing 14-6). The Court observes that William did not say that Angela was an owner of the vehicle, even in response to a direct question, only that "of course her name is on the cover," apparently referring to the cover of a "build book." Filing 14-6.[4] Whatever William meant by "of course [Angela's] name is on the cover," only speculation would take it to mean that Cal "was instructed by William Barbato to name Angela as the owner of the vehicle and put her on all publications." Filing 14-1 at 2 (¶ 4) (citing Filing 14-6). Again, the value of such a speculative inference is substantially outweighed by its lack of foundation and its potential for confusing or misleading the jury. Fed. R. Evid. 403.

Cal also asserts that Angela made payments to Cal for work conducted on the 1933 Pontiac Sedan. Filing 15 at 5 (citing Filing 14-1 at 2 (¶ 6), in turn citing Filing 14-8). Admissible evidence is also lacking to support this allegation. First, Leach avers,

> I am aware that Angela Barbato did pay invoices related to the 1933 Pontiac Sedan and have attached a February 8, 2025 text message between myself and Bill Barbato wherein he was going to sit with his wife about paying an invoice. Exhibit 7.

Filing 14-1 at 2 (¶ 6). However, nothing but speculation connects Angela to any payment. As Angela points out, Cal has not produced any check, invoice, or related communication from Angela showing a payment or promising any payment. Filing 18 at 1. Furthermore, the text

---

[4] This ambiguous text exchange is as follows:

> Q: For your build book and the magazines and such, do you want the car to be under your name or add Angela also?
> A: hi Annali, sorry for getting back to you a little later on this answer but I was dealing with a phone call. Had people wanting to wish me merry Christmas so I was on the phone for quite a while now I'm back to you of course Angela is gonna be on the cover, the front cover of everything No Lol
> Q: I'm sorry bill. I'm confused. For the car owners do you want A. Bill Barbato or B. Bill & Angela Barbato[?]
> A: I'm sorry for confusing you Annali I guess that no should've been after everything meaning no you don't think so. Then laughing out loud anyway of course her name is on the cover.

Filing 14-6.

message Leach points to is hearsay, but even if it somehow is not hearsay, only speculation creates any inference that William indicated that Angela would be making any payment to Cal. William's statement in the text message was this: "I'm going to sit with Angel [sic] and get some money sent to you when I received [sic] the check from the show that will go to you. I will get you paid Andy." Filing 14-8 at 1. Even supposing "sit[ting] with Angel" indicates a discussion of finances, the statement is that William will "get some money sent," when William has received a check from the show that would go to Cal, and that William would "get you paid Andy." The wholly speculative inference that Angela might make a payment is substantially outweighed by its lack of foundation and its potential for confusing or misleading the jury. Fed. R. Evid. 403.

Cal offers no admissible evidence in support of its contentions concerning Angela's ownership of the 1933 Pontiac Sedan or any payment from her for the work on it, and Cal cannot simply rely on its bare pleadings. *Aaron Ferer & Sons Co.*, 564 F.2d at 1215 (8th Cir. 1977) (citing *Block Indus.*, 495 F.2d at 259); *see also Taylor*, 2008 WL 4772558, at *1; *Rivera*, 2007 WL 4208817, at *3; *Zapata*, 2007 WL 2994652, at *1.

> b. Cal Has Not Carried Its Burden to Show that Angela Has Sufficient Contacts for Personal Jurisdiction

The Court concludes that, where Cal lacks admissible evidence and its bare allegations are insufficient, Cal has failed to meet its burden on a motion to dismiss for lack of personal jurisdiction to "plead sufficient facts to support a reasonable inference that [Angela] can be subjected to jurisdiction within the state." *Creative Calling Sols., Inc.*, 799 F.3d at 979. General jurisdiction over Angela is lacking because the only reasonable inferences that can be drawn from Cal's inadmissible evidence and bare pleadings is that Angela had a handful of sporadic contacts with Nebraska consisting of knowledge that William was having work done on the Pontiac in Nebraska, joined William in celebrating his car show award, and knew that William was planning

16

further payments to Cal in Nebraska. Contrary to Cal's assertions, these contacts fall well short of "transacting business" in Nebraska under Neb. Rev. Stat. § 25-536. Filing 15 at 5. The Nebraska Supreme Court has found sufficient evidence of "transacting business" within the meaning of the statute, for example, where a defendant had an oral contract with a state resident and made some payments on the agreement. *Quality Pork Int'l v. Rupari Food Servs., Inc.*, 675 N.W.2d 642, 649 (Neb. 2004). There is no admissible evidence of any such contacts here. Cal has also failed to identify the "continuous and systematic" contacts required for general jurisdiction. *See Wade*, 100 F.4th at 993 (quoting *Goodyear Dunop Tires*, 564 U.S. at 919). The few contacts that can be supported by the record are "random [and] fortuitous," as well as very attenuated, which is simply not enough for general jurisdiction. *Wade*, 100 F.4th at 993 (quoting *Walden*, 571 U.S. at 286).

Cal has come no closer to pleading specific personal jurisdiction over Angela. The contacts alleged and adequately supported—that Angela knew William was having work done on the Pontiac, joined William in celebrating his car show award, and knew that William was planning further payments to Cal—fall well short of the "purposeful availment" to warrant the exercise of personal jurisdiction. *See Fuld*, 606 U.S. at 12–13. Although these purported contacts have some relationship to Cal's claims, the Court cannot say that Cal's claims "aris[e] out of or relat[e] to [Angela's] contacts with the forum." *See Wade*, 100 F.4th at 993 (cleaned up). The contacts are still only "random and fortuitous," which is not enough for specific personal jurisdiction, and they are too attenuated from the business transactions giving rise to Cal's claims to support specific personal jurisdiction. *Id.*

Framing the analysis in the context of the five-factor test for determining whether personal jurisdiction satisfies due process makes the inadequacy of Cal's allegations and purported evidence abundantly clear. *See Hawkeye Gold, LLC*, 89 F.4th at 1032 (explaining the five-factor analysis

17

and the totality of the circumstances test for personal jurisdiction). As indicated above, Angela's contacts with Nebraska are of slight value and they are random and fortuitous. *Id.* (first factor is the nature and quality of the contacts with the forum). Those contacts are also few and sporadic. *Id.* (second factor is the quantity of such contacts). Perhaps most importantly, the relation of Cal's causes of action at issue to the contacts reasonably attributable to Angela is very attenuated. *Id.* (third factor addressing specific personal jurisdiction is the relation of the cause of action to the contacts). The last two, less weighty factors, do not change the balance in the totality of the circumstances: Nebraska may have some interest in providing a forum for Cal, a resident claiming that it was not paid for services, but this forum is inconvenient for Angela, where she has only been in the forum once for an unrelated, non-business reason. *Id.* (fourth factor is the interest of the forum state in providing a forum for its residents and the fifth is convenience of the parties). Considering the totality of the circumstances, nothing here suggests that asserting personal jurisdiction over Angela and maintaining the lawsuit against her would not offend traditional conceptions of fair play and substantial justice; indeed, the totality of the circumstances shows just the opposite. *Id.*

### D. Summary

Having considered Cal's allegations, the admissible evidence (or more accurately the lack thereof), and the pertinent factors, Angela's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction is granted. All claims against her are dismissed for lack of personal jurisdiction.

### III. THE MOTION FOR PARTIAL DISMISSAL OF COUNTERCLAIMS AND CROSS-CLAIMS

The Court turns now to Cal's and Leach's Motion for Partial Dismissal of William's Counterclaim and Third-Party Complaint. Filing 27. The challenged claims are for fraud and

concealment (Second Claim for Relief); violation of the Nebraska Consumer Protection Act (NCPA) (Third Claim for Relief); estoppel (Fourth Claim for Relief); and unjust enrichment (Fifth Claim for Relief). Filing 8 at 8–11. The Court begins with a summary of the additional factual background to this Motion.

### A. Additional Factual Background

What is now at issue is a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Therefore, the Court considers the following allegations from William's Counterclaim and Third-Party Complaint as true—to the extent that they are nonconclusory—for the purposes of ruling on this Motion. *See Bauer v. AGA Serv. Co.*, 25 F.4th 587, 589 (8th Cir. 2022) (citing *Pietoso, Inc. v. Republic Servs., Inc.*, 4 F.4th 620, 622 (8th Cir. 2021)).

William alleges that he is the owner of the 1933 Pontiac Sedan at issue in this case. Filing 8 at 5 (¶ 7). He alleges that in 2016 he was "induced" to deliver the 1933 Pontiac Sedan to Cal and Leach. Filing 8 at 5 (¶ 8). He also alleges that Cal and Leach "represented that they could perform a complete restoration and increase the value of the Pontiac to well over $1,000,000 for under $550,000." Filing 8 at 6 (¶ 9). The restoration by Cal and Leach did not include certain things: The engine, transmission, rear differential, and the frame had already been done and paid for by William in New Jersey, and the painting of the main body of the Pontiac was done by an entity in Houston, Texas. Filing 8 at 6 (¶¶ 10–11).

William alleges that Cal and Leach engaged in the following "scheme":

12.     Over the course of the next nine years, Defendants engaged in an ongoing scheme where they would keep representing to William that the Pontiac was near completion and would be promptly completed if William paid them more money.

13.     As part of the scheme, Defendants would send an invoice, William would be forced to pay that invoice based upon Defendants' representations that the Pontiac was near completion and because Defendants had possession of the Pontiac in Nebraska.

14.    After William would pay an invoice, Defendants would send another invoice claiming more work needed to be done to complete the Pontiac and for Defendants to return possession of the Pontiac to William.

Filing 8 at 6 (¶¶ 12–14). William alleges that he paid Cal and Leach "a total of at least $1,612,571.72." Filing 8 at 6 (¶ 15).

Matters came to head in 2025 when Cal and Leach allegedly "fabricated" another $378,337.49 in charges and demanded payment from William. Filing 8 at 6 (¶ 16). On or about March 13, 2025, "[c]onsistent with their pattern and practice," Cal and Leach allegedly represented that the 1933 Pontiac Sedan needed another $85,000 of work on top of the prior amount. Filing 8 at 6 (¶ 17). According to William, Cal and Leach represented to him that they would return the vehicle to him if he paid another $463,337.49 or "alternatively" that they would withdraw the demand for more money "if he transferred title to the Pontiac to Cal Creations." Filing 8 at 7 (¶¶ 18–19). On or about March 19, 2025, Cal and Leach allegedly gave William a proposed bill of sale transferring title of the vehicle to Cal for $1 and then threatened to sue William if he did not execute the bill of sale or pay them $378,337.49. Filing 8 at 7 (¶ 20). William alleges that Cal and Leach continue to retain possession of the Pontiac Sedan. Filing 8 at 7 (¶ 21).

The Court will discuss in turn the challenged counterclaims and third-party claims and any additional facts relevant to those claims. However, the Court will next summarize the standards applicable to the challenges to those claims for failure to state claims upon which relief can be granted.

### B.  Applicable Standards

As a general argument applicable to the entire Motion for Partial Dismissal, William argues that "Cal Creations['] and Leach's facial challenge pertains to the amount of detail in the Counterclaim, not whether it states claims upon which relief can be granted." Filing 31 at 3. However, William contends that "[t]he Counterclaim adequately states viable claims upon which

relief can be granted under Nebraska law." Filing 31 at 3. The standards for pleading a claim under the Federal Rules of Civil Procedure and applicable precedent lead the Court to a different conclusion.

To state a claim, "a pleading"[5] need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Nevertheless, Federal Rule of Civil Procedure 12(b)(6) provides for a motion filed pre-answer (or pre-responsive pleading) to dismiss claims "in any pleading" asserting "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "A claim survives a Rule 12(b)(6) motion to dismiss only if the [pleading's] nonconclusory allegations, accepted as true, make it not just 'conceivable' but 'plausible' that the [opposing party] is liable." *Mitchell v. Kirchmeier*, 28 F.4th 888, 895 (8th Cir. 2022) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009)). To put it another way, a court "must determine whether a [a party's pleading] 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Far E. Aluminium Works Co. v. Viracon, Inc.*, 27 F.4th 1361, 1364 (8th Cir. 2022) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009)).

---

[5] Federal Rule of Civil Procedure 7(a) identifies allowable pleadings as follows:

> (a) Pleadings. Only these pleadings are allowed:
> (1) a complaint;
> (2) an answer to a complaint;
> (3) an answer to a counterclaim designated as a counterclaim;
> (4) an answer to a crossclaim;
> (5) a third-party complaint;
> (6) an answer to a third-party complaint; and
> (7) if the court orders one, a reply to an answer.

Fed. R. Civ. P. 7(a). A "counterclaim" is conspicuous by its absence from this list. However, Federal Rule of Civil Procedure 13 allows for a "claim" "against an opposing party" as a "compulsory" or "permissive" counterclaim to be stated in "[a] pleading," such as an answer. Fed. R. Civ. P. 13(a)–(b). Hence, the pleading requirements of Federal Rules of Civil Procedure 8(a)(2) and 12(b)(6) apply to counterclaims as well as "pleadings," such as answers to third-party complaints.

In ruling on a Rule 12(b)(6) motion, a court must "accept 'the facts alleged in the [pleading] as true and draw[ ] all reasonable inferences in favor of the nonmovant.'" *Bauer*, 25 F.4th at 589 (citation omitted). On the other hand, "[m]ere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the [opposing party] is liable." *Richardson v. BNSF Ry. Co.*, 2 F.4th 1063, 1068 (8th Cir. 2021) (internal quotation marks and citations omitted). A court also need not accept a pleader's "legal conclusions drawn from the facts." *Knowles v. TD Ameritrade Holding Corp.*, 2 F.4th 751, 755 (8th Cir. 2021). Nor is a court required to wait to see if more specific information becomes available through the discovery process to decide if a pleading can state a claim. *Steinbuch v. Cutler*, 518 F.3d 580, 591 (8th Cir. 2008) (finding no abuse of discretion in refusing to allow discovery where a pleading lacked sufficient factual allegations to state a claim). Ultimately, "[a] claim is plausible when 'the [pleader] pleads factual content that allows the court to draw the reasonable inference that the [opposing party] is liable for the misconduct alleged.'" *Christopherson v. Bushner*, 33 F.4th 495, 499 (8th Cir. 2022) (quoting *Iqbal*, 556 U.S. at 678). In contrast, "'[w]here a [pleading] pleads facts that are merely consistent with [an opposing party's] liability, it stops short of the line between possibility and plausibility." *Id.* (internal quotation marks and citations omitted).

Under this standard, "'threadbare recitals of the elements of a cause of action' cannot survive a [Rule 12(b)(6)] motion to dismiss." *Du Bois v. Bd. of Regents of Univ. of Minnesota*, 987 F.3d 1199, 1205 (8th Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678). The pleader is not required to plead facts establishing a prima facie case to survive a Rule 12(b)(6) motion, because the prima facie case is an evidentiary standard, not a pleading requirement. *Wilson v. Ark. Dep't of Hum. Servs.*, 850 F.3d 368, 372 (8th Cir. 2017) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511

22

(2002)). Even so, the "elements of the prima facie case are [not] irrelevant to a plausibility determination." *Blomker v. Jewell*, 831 F.3d 1051, 1056 (8th Cir. 2016) (cleaned up). Instead, "such elements are part of the background against which a plausibility determination should be made." *Id.* Specifically, the elements may be used as a "prism to shed light upon the plausibility of the claim." *Id.* (citation omitted). The Eighth Circuit Court of Appeals has cautioned that "the [pleading] should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594.

With these standards in mind, the Court turns to consideration of the challenged counterclaims and third-party claims.

## C. The Challenged Claims

### 1. The Claim for Fraud and Concealment

William's Second Claim for Relief alleges "Fraud and Concealment." Filing 8 at 8. It alleges that "Defendants" made false representations including the following and either knew or should have known the representations were false:

    a.    They could perform a complete restoration of the Pontiac;

    b.    They could increase the value of the Pontiac to well over $1,000,000 for under $550,000;

    c.    That [William] would only owe a little bit for labor after the show was completed;

    d.    The Pontiac restoration would be completed soon;

    e.    If William just pays another invoice, the Pontiac would be completed; and

    f.    No work would be performed on the Pontiac without William's authorization.

    31.    Defendants further submitted numerous invoices to William reflecting services that were not performed, services that were not necessary, services that were not authorized, and/or charges that were inflated.

23

Filing 8 at 8 (¶¶ 30–33). William alleges that "Defendants" also "concealed material information" from him, "including that they were conning and scamming him, they wanted to see how much money they could take from him, one of their main goals was to acquire the Pontiac, they had no intention of completing the Pontiac, and they had no intention of returning the Pontiac to William." Filing 8 at 8 (¶ 34).

William alleges that "Defendants" made the misrepresentations with the intent that William would rely on them including "by hiring Cal Creations, paying invoice after invoice, paying over $1,612,571.72 to Defendants, delivering the Pontiac to Defendants, and transferring title of the Pontiac to Cal Creations." Filing 8 at 8–9 (¶ 35). William alleges that he did rely on "Defendants' misrepresentations and concealment "by hiring Cal Creations, paying invoice after invoice, paying over $1,612,571.72 to Defendants, and delivering the Pontiac to Defendants." Filing 8 at 9 (¶ 36). William alleges that as a direct and proximate result of "Defendants' fraud," he has suffered damages including the $1,612,571.72 that he alleges he has paid to "Defendants." Filing 8 at 9 (¶ 37).

a.   The Parties' Arguments

Cal and Leach argue that William's fraudulent misrepresentation claim fails to meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Filing 28 at 8. They point out that William fails to specify which of "Defendants" made any representations, even though he was required to identify which of them was responsible for acts of fraud. Filing 28 at 9. Cal and Leach argue further that William does not identify the time and place when any of the alleged misrepresentations were made, which is particularly important when the claimed misrepresentations allegedly spanned nine years. Filing 28 at 9–10. Cal and Leach claim that the fraudulent concealment claim also does not meet the requirements of Rule 9(b). Filing 28 at 11. They contend that William fails to identify who concealed what information, or when and how the

24

alleged concealment occurred. Filing 28 at 11. Cal and Leach argue that William's fraudulent concealment claim fails for the additional reason that William does not identify what information was concealed and instead pleads that "Defendants" concealed some of their intentions. Filing 28 at 11.

In response, William argues in the "Introduction" to his opposition brief that "Leach is a named defendant, so all allegations against 'the Defendants' include Leach." Filing 31 at 2. He then argues that "Leach is the owner of Cal Creations [and] made the fraudulent statements," so "[Leach] cannot use the corporate form to shield himself from his own fraudulent . . . acts." Filing 31 at 2.[6] In the part of his brief specifically addressing the fraud-based claims, William asserts that he has sufficiently pleaded both the fraudulent misrepresentation and the fraudulent concealment parts of this claim. Filing 31 at 3. He sets out the elements of fraudulent misrepresentation and fraudulent concealment under Nebraska law. Filing 31 at 3–4. He then reiterates the allegations in his pleading. Filing 31 at 4–5. He concludes by arguing the following:

> William adequately pled a claim for fraud and concealment. William detailed the false representations (Doc. 8, Pg. 8, ¶¶ 30-31), Cal Creations['] and Leach's acts of concealment (Doc. 8, Pg. 8, ¶ 34), and the specific ways in which William relied upon the representations and concealments of Cal Creations and Leach (Doc. 8, Pg. 8, ¶ 34). If William's allegations are true, then William is entitled to relief. Consequently, the Partial Motion to Dismiss should be denied.

Filing 31 at 5–6.

In reply, Cal and Leach reiterate that William's fraud-based claims are deficiently pleaded under Rule 9(b). Filing 32 at 4. They assert that William's identification of Leach as a named Defendant and his assertion that all allegations against "Defendants" include Leach does not meet the Rule 9(b) requirement to specify which defendant made misrepresentations or committed

---

[6] William's actual contention states, "William cannot use the corporate form to shield himself from his own fraudulent . . . acts," Filing 32 at 4, but that must be a scrivener's error. There are no allegations that William has any corporate form, and William certainly did not intend to allege that he committed any fraudulent acts. Filing 8 passim.

fraudulent acts. Filing 32 at 4. Cal and Leach contend that simply "lump[ing]" all defendants together means that the defendants must guess which fraudulent activity is attributed to each of them. Filing 32 at 4. They add that if William is asserting that the misrepresentations were made solely by Leach, as an individual and in his capacity as an owner of Cal, then William should have alleged that in his pleading. Filing 32 at 5.

       b.   Standards for Pleading Fraud

In addition to the Rule 8(b) and Rule 12(b)(6) standards set out above in § III.B., pleadings of fraud claims must satisfy the "particularity" requirements of Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b) (stating in pertinent part, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). The Eighth Circuit Court of Appeals has repeatedly stated, "In other words, [Federal] Rule 9(b) requires plaintiffs to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *UMB Bank, N.A. v. Guerin*, 89 F.4th 1047, 1051 (8th Cir. 2024) (quoting *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 353 (8th Cir. 2011)). Somewhat more specifically, "[w]hen Rule 9(b) applies, the complaint must allege such matters as the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." *Collins v. Metro. Life Ins. Co.*, 117 F.4th 1010, 1017 (8th Cir. 2024) (cleaned up), *cert. denied*, 145 S. Ct. 1310 (2025); *United States ex rel. Holt v. Medicare Medicaid Advisors, Inc.*, 115 F.4th 908, 916 (8th Cir. 2024) (same).

When multiple defendants are alleged to have participated in the fraud, the claimant must "plead with particularity which defendant made what representation to the [claimant]," as well as "the nature of any Defendant's participation in a specific misrepresentation." *Christopherson v. Bushner*, 33 F.4th 495, 502–03 (8th Cir. 2022); *Streambend Properties II, LLC v. Ivy Tower Minneapolis, LLC*, 781 F.3d 1003, 1013 (8th Cir. 2015) (explaining that under Rule 9(b) "[w]here

multiple defendants are asked to respond to allegations of fraud, the complaint [must] inform each defendant of the nature of his alleged participation in the fraud—that is, specify the time, place, and content of each defendant's false representations, including when the acts occurred, [and] who engaged in them" (quotations omitted)). Furthermore, "[t]hough Rule 9(b) does not require alleging the 'specific details of *every* alleged fraudulent claim,' [the Eighth Circuit has] dismissed [a] claim because the claimant 'must provide some representative examples of [the] alleged fraudulent conduct, specifying the time, place, and content of [the] acts and the identity of the actors." *United States ex rel. Strubbe v. Crawford Cnty. Mem'l Hosp.*, 915 F.3d 1158, 1164 (8th Cir. 2019) (quoting *United States ex rel. Joshi v. St. Luke's Hosp., Inc.*, 441 F.3d 552, 557 (8th Cir. 2006)).

### c. The Fraud and Concealment Claim Does Not Satisfy Applicable Pleading Standards

William's pleading of his fraud and concealment claim in the Second Claim for Relief in his Counterclaim and Third-Party Complaint fall well short of meeting the "particularity" requirements of Federal Rule of Civil Procedure 9(b). Fed. R. Civ. P. 9(b); *UMB Bank*, 89 F.4th at 1051. William reiterates the allegations in his pleading, Filing 31 at 4–5, but with no attempt to demonstrate how those allegations satisfy either the elements of the claims or the requirements of Rule 9(b) or Rule 12(b)(6). The pleading does not satisfy all the requirements of the "first paragraph of any newspaper story," consisting of the "who, what, when, where, and how" of the alleged misrepresentations. *UMB Bank*, 89 F.4th at 1051.[7] At most, what was misrepresented is set out in general terms in Filing 8 at 8 (¶¶ 30–31), but those allegations are completely lacking in

---

[7] The Defendants argue that William pleads that "Defendants" concealed some of their intentions, which they argue does not state a fraudulent concealment claim. Filing 28 at 11. The Court need not reach that issue because of the other obvious deficiencies of the pleading of the fraudulent concealment alternative of this claim. *But see Fisher v. Keeler*, 7 N.W.2d 659, 663 (Neb. 1943) ("[T]he defendant was guilty of fraud in concealing from the plaintiff his true intention to the disadvantage of plaintiff. . . .").

information about the "who, . . . when, where, and how" relating to any alleged misrepresentations. *UNB Bank*, 89 F.4th at 1051. The Court agrees with Defendants that it is not enough to plead that someone, under some circumstance, at some place and time in the last nine years, made some allegedly false statement. *Id.* Although William may not have been required to allege the "specific details of *every* alleged fraudulent claim," he was required to plead at least some representative examples of fraudulent conduct that satisfy the requirements of Rule 9(b). *Strubbe*, 915 F.3d at 1164 (emphasis in the original; citation omitted). William failed to plead any such representative examples to the requisite standard. *Id.*

Furthermore, the identity of the person making the alleged misrepresentations is stated only obscurely as "Defendants." *See Collins*, 117 F.4th at 1017 (explaining that the claimant must plead *inter alia* "the identity of the person making the misrepresentation"). That is insufficient when multiple defendants are alleged to have participated in the fraud; rather, a claimant must "plead with particularity which defendant made what representations to the [claimant]," as well as "the nature of any Defendant's participation in a specific misrepresentation." *Christopherson*, 33 F.4th at 502–03; *Streambend Properties II*, 781 F.3d at 1013. William's argument that "Defendants" includes Leach certainly does not indicate what specific misrepresentations are also or only claimed to have been made by Leach or by Cal through some other agent. Defendants are correct that William did not plead that the misrepresentations were made solely by Leach, as an individual and in his capacity as an owner of Cal. Filing 32 at 5. Moreover, even if William cured the deficiency as to identity of the Defendant who made any alleged misrepresentation, the other requirements are Rule 9(b) are not met. Failure to meet those requirements means that William's fraud claim also is not plausibly pleaded under Rule 12(b). *Far E. Aluminium Works Co.*, 27 F.4th at 1364 (explaining that on a Rule 12(b) motion to dismiss, a court "must determine whether [a

party's pleading] contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)).

In short, William has not plausibly pleaded his fraud and concealment claim to the standards set out in Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, so Cal's and Leach's Motion to Dismiss is granted as to William's Second Claim for Relief in William's Counterclaim and Third-Party Complaint.

### 2. *The Nebraska Consumer Protection Act Claim*

Cal and Leach also challenge William's Third Claim for Relief alleging violation of the Nebraska Consumer Protection Act (NCPA). Filing 28 at 5. This claim alleges the following:

> 39.    Defendants have engaged in unfair and deceptive acts and practices in the conduct of commerce.
>
> 40.    These acts and practices include, but are not limited to:
>
> > a)  Making false promises and representations;
> > b)  Scheming to defraud customers out of property and money;
> > c)  Fabricating and inflating charges;
> > d)  Billing customers for work that was not authorized;
> > e)  Charging for work that was not reasonable nor necessary;
> > f)  Using its possession of customer property as leverage to demand and coerce payments of money that was not owed; and
> > g)  Refusing to timely and promptly return customer property.
>
> 41.    Upon information and belief, Defendants have engaged in and continue to engage in similar unfair and deceptive acts and practices in Nebraska and have engaged in a pattern of calculated conduct intended to defraud citizens of Nebraska.
>
> 42.    Defendants' unfair and deceptive acts and practices affect the public interest of Nebraska.
>
> 43.    As a result of Defendants' unfair and deceptive acts and practices, William has suffered damages in an amount to be determined at trial.
>
> 44.    William further requests costs and attorney fees as authorized by Neb. Rev. Stat. § 59-1609.

Filing 8 at 9–10 (¶¶ 39–44).

a.  The Parties' Arguments

Cal and Leach argue that the NCPA is not available to redress a private wrong where the public interest is unaffected; rather, they assert that citizens of Nebraska must be affected. Filing 28 at 5. Cal and Leach argue that William's allegations involve only a private transaction, the custom build of a single vehicle, which does not impact the public interest. Filing 28 at 6. Furthermore, they argue that William does not identify anyone other than himself who was affected by the conduct alleged in his NCPA claim. Filing 28 at 6. Cal and Leach argue that William cannot transform this private dispute into a matter impacting the public interest simply by alleging "[u]pon information and belief" that Cal and Leach have engaged in and continue to engage in a pattern and practice of engaging in similar conduct intended to defraud Nebraska citizens, because such an allegation lacks well-pleaded facts and is instead based on speculation. Filing 28 at 6–7. Finally, they argue that the NCPA claim is grounded in alleged fraud, so that it is subject to Rule 9(b)'s pleading requirements, but the claim does not satisfy those requirements. Filing 28 at 7.

William argues that this claim alleges more than a simple breach of contract and instead alleges inherently inequitable conduct. Filing 31 at 6. He asserts that the scheme to take more and more of his money, using his vehicle as leverage, until he ran out of money was unfair, deceptive, and violated the NCPA. Filing 31 at 7. Contrary to Cal's and Leach's position, William argues that he has alleged that the public interest of Nebraska has been impacted because Cal is a Nebraska company and Leach is a Nebraska resident. Filing 31 at 7. Thus, he argues that Cal and Leach are furnishing services in Nebraska, inducing out-of-state residents to transact business in Nebraska under false pretenses, and now using Nebraska courts to try to retain the Pontiac. Filing 31 at 7. He asserts that these allegations are sufficient to exceed what he calls the "minimal threshold" to survive a motion to dismiss his NCPA claim. Filing 31 at 8. He also contends that he has specifically alleged unfair and deceptive practices in commerce that have affected the public

interest of Nebraska. Filing 31 at 8 (citing Filing 8 at 9–10 (¶¶ 39–42)). Thus, he contends that he has plausibly pleaded this claim. Filing 31 at 8.

In reply, Cal and Leach argue that William has not identified a single Nebraska consumer impacted by the allegedly deceptive conduct. Filing 32 at 2. They argue that William is instead attempting to shift the focus to Cal's and Leach's presence in this state. Filing 32 at 2–3. They assert that the "Nebraska-based requirement" focuses on the plaintiffs not the defendants on such a claim. Filing 32 at 3. They argue that it is not enough to allege unfair and deceptive conduct regardless of its impact on Nebraska consumers. Filing 32 at 3. Thus, they argue that William's attempt to disguise what is simply an isolated transaction with no impact on Nebraska consumers as a deceptive practice in violation of the NCPA is unavailing. Filing 32 at 4.

      b.   NCPA Requirements

The Nebraska Consumer Protection Act (NCPA), Neb. Rev. Stat. §§ 59-1601 to 59-1622, "is Nebraska's version of the Sherman Act, but it also encompasses portions of other federal antitrust laws, including the [Federal Trade Commission Act (FTCA)]." *Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017). As pertinent here, Neb. Rev. Stat. § 59-1602 states that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful." *Id.* (quoting § 59-1602). Section 59-1602 is one of the provisions of the NCPA that is "modeled" on the FTCA, specifically, 15 U.S.C. § 45(a)(1). *Id.*

Not all unfair or deceptive acts in the conduct of trade or commerce fall within the scope of the NCPA's prohibitions. Rather, "[t]he [N]CPA's scope is limited to 'the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska.'" *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 12 (Neb. 2008) (quoting Neb. Rev. Stat. § 59–1601(2)). Based on that limiting language, the Nebraska Supreme Court has "held that the CPA

only applies to unfair or deceptive practices which affect the 'public interest.'" *Id.* (citing *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 141 (Neb. 2000)). As to who can bring a NCPA claim, the Nebraska Supreme Court has stated,

> Section 59–1609 creates a private right of action to persons injured by certain violations of the CPA, including violations of § 59–1602. Any person so injured "may bring a civil action in the district court to enjoin further violations, to recover the actual damages sustained by him, or both, together with the costs of the suit, including a reasonable attorney's fee." § 59–1609.

*Nelson*, 605 N.W.2d at 141.

> c.   William Does Not State a Claim under the NCPA

The Court finds William's pleading of his NCPA claim is deficient for failure to plead a plausible basis for asserting Cal's and Leach's conduct "directly or indirectly affect[ed] the people of the State of Nebraska." Neb. Rev. Stat. § 59–1601(2); *Eicher*, 748 N.W.2d at 12; *Nelson*, 605 N.W.2d at 141. The Court finds William's NCPA claim is also deficient for failure to plead a claim of fraud with the particularity required by Federal Rule of Civil Procedure 9(b).

The Court finds that the decision in *Nelson* is particularly instructive on the "public interest" issue that is the basis for Cal's and Leach's challenge to William's NCPA claim. In *Nelson*, the Nebraska Supreme Court considered the NCPA claim under § 59-1602 brought by the purchaser of a 1993 Jeep Grand Cherokee from the defendant. 605 N.W.2d at 139. The defendant had allegedly not disclosed that the vehicle had previously carried a salvage title and that all the manufacturer's warranties had been released, but the defendant refused to give the buyer his money back. *Id.* at 139–140.

The Nebraska Supreme Court explained that the terms "trade" and "commerce," as used in § 59-1602, are defined by § 59–1601(2) as "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska." *Nelson*, 605 N.W.2d at 141 (quoting § 59-1601(2)). The court then explained,

The CPA contains limiting language that cannot be ignored. While it is true that the CPA does not limit its reach to conduct in the course of business, vocation, or occupation, as does the Uniform Deceptive Trade Practices Act found at Neb.Rev.Stat. § 87–301 *et seq.* (Reissue 1999), *see* § 87–302(a), the Legislature's intent to limit the application of the CPA is clear. The CPA defines "trade and commerce" as "the sale of assets or services and any commerce *directly or indirectly affecting the people of the State of Nebraska.*" (Emphasis supplied.) § 59–1601(2). We read this definition to limit the disputes that fall within the ambit of § 59–1602 to unfair or deceptive acts or practices that affect the public interest. To be actionable under the CPA, therefore, we conclude that the unfair or deceptive act or practice must have an impact upon the public interest. The act is not available to redress a private wrong where the public interest is unaffected.

Furthermore, if the Legislature had intended the CPA to cover all private causes of action, then the limiting language found in § 59–1601(2) would not have been included. In construing a statute, effect must be given, if possible, to all of its several parts; no word, clause, or sentence should be rejected as meaningless or superfluous if it can be avoided. The Legislature could have defined "trade and commerce" as "the sale of assets or services and any commerce." The Legislature chose, however, to add the limiting language "directly or indirectly affecting the people of the State of Nebraska." *See* § 59–1601(2). We cannot ignore this language and apply the CPA to isolated transactions between individuals that do not have an impact on consumers at large. To do so would be a misconstruction of the statute.

*Nelson*, 605 N.W.2d at 141–42 (non-statutory citations omitted). The court reasoned further that if it did not draw this line, then "the [N]CPA would apply to every single transaction in which there was an alleged unfair or deceptive act or practice. It would even apply to transactions in the context of flea markets or garage sales." *Id.* at 142. The court rejected such a reading of the NCPA. *Id.*

Applying this limitation on the reach of the NCPA, the court concluded in *Nelson* as follows:

Under the facts of this case, the transfer of the Jeep from appellants to appellee affected no one other than the parties to the transaction, and appellee has not shown a sufficient impact indirectly or directly on the public to qualify the transaction as an act or practice which is prohibited under § 59–1602. We therefore conclude that the trial court erred when it found that the CPA applied to appellants' fraudulent acts.

*Nelson*, 605 N.W.2d at 142.

33

In subsequent cases, the Nebraska Supreme Court has cast more light on what the "public interest" limitation in the NCPA means by identifying circumstances in which the limitation was met—the opposite of the situation in *Nelson*. In *Arthur v. Microsoft Corp.*, 676 N.W.2d 29 (Neb. 2004), the plaintiffs alleged that membership of the class affected by Microsoft's alleged monopoly pricing activities was in excess of 4,000 people residing in Nebraska, with the exact number being known to Microsoft. 676 N.W.2d at 38. The court explained,

> We conclude that the plaintiffs have set forth sufficient facts in their amended petition to show that the public interest is affected. Under the facts alleged, the practices of Microsoft affect the people of the State of Nebraska. Thus, the district court erred in sustaining Microsoft's demurrer as to the plaintiffs' antitrust claim under the [NCPA].

*Arthur*, 676 N.W.2d at 38.

Subsequently, the Nebraska Supreme Court reached a similar conclusion on the applicability of the NCPA to the claim of one of thirteen individuals who alleged that while their homes were in foreclosure, the defendants told them that they would loan them money to save their homes, but the defendants then fraudulently obtained title to the homes. *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 6–7 (Neb. 2008). Based on the "public interest" limitation on NCPA claims, the defendants argued that the NCPA did not apply because the transaction involved only the one plaintiff and the named defendants, not the public at large. *Id.* at 12. The Nebraska Supreme Court pointed out that the individual plaintiff would have recovered along with the other plaintiffs but for the district court's mistaken conclusion that his claim was procedurally barred. *Id.* The court concluded further that the individual plaintiff's claim "depends on the same allegations raised by the other plaintiffs—that is, that defendants engaged in a pattern of calculated conduct intended to defraud numerous citizens of this state of their homes." *Id.* Thus, the court found no merit in the defendants' contention that the CPA did not apply to their transactions. *Id.*

William's NCPA claim is similar to the claim in *Nelson*, because it does not allege "a dispute[ ] that fall[s] within the ambit of § 59-1602," where the statute prohibits "unfair or deceptive acts or practices that affect the public interest." 605 N.W.2d at 141. His NCPA claim is not actionable because William has not plausibly alleged "that the unfair or deceptive act or practice . . . ha[d] an impact upon the public interest" but only a "private wrong where the public interest is unaffected." *Id*. at 142. Much like the facts in *Nelson*, the transaction to restore the 1933 Pontiac Sedan affected no parties other than Cal, Leach, and William, who were the parties to the transaction. *Id.* In other words, this was an "isolated transaction between individuals that d[id] not have an impact on consumers at large," so the NCPA does not apply. *Id.* William's claim does not identify any other consumers, let alone "consumers at large," who were impacted by Cal's and Leach's allegedly deceptive conduct. *Id.* William's NCPA claim is distinguishable from the claim in *Arthur*, 676 N.W.2d at 38, which involved conduct that affected at least 4,000 consumers in Nebraska, and from the claim in *Eicher*, 748 N.W.2d at 12, in which at least a dozen other Nebraska consumers had raised the same allegations against the defendants as the one claimant whose NCPA claim was before the court.

The Court agrees with Cal and Leach that William's allegation, "[u]pon information and belief" that "defendants have engaged in and continue to engage in similar unfair and deceptive acts and practices in Nebraska and have engaged in a pattern of calculated conduct intended to defraud citizens of Nebraska," Filing 8 at 9–10 (¶ 41), is unsupported by the pleading of any facts making the allegation plausible. The allegation is instead conclusory and speculative and therefore insufficient to state a claim. *Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the [opposing party] is liable." (internal

quotation marks and citations omitted)). William's attempt in his brief to shift the focus to Cal's and Leach's presence doing business in Nebraska, Filing 31 at 7, misses the point of the NCPA which is to protect consumers in Nebraska who are affected by the prohibited conduct. *See Eicher,* 748 N.W.2d at 12 (quoting Neb. Rev. Stat. § 59–1601(2)); *Nelson,* 605 N.W.2d at 142 (explaining the transaction must have "an impact on consumers at large" for the NCPA to apply).

Lastly as to this claim, the Court agrees with Defendants that William has failed to plead this fraud-based claim with the particularity required by Federal Rule of Civil Procedure 9(b). *See* Filing 8 at 9 (¶ 40) (alleging fraudulent acts as the basis for the NCPA claim). Once again, William's pleading fails to identify either the "who, what, when, where, and how" of the alleged misrepresentations, *UMB Bank,* 89 F.4th at 1051, or the identity and involvement of any particular Defendant in the allegedly fraudulent conduct, *Christopherson,* 33 F.4th at 502–03; *Streambend Properties II,* 781 F.3d at 1013. This ground would also be sufficient to require dismissal of William's NCPA claim.

In short, William has not plausibly pleaded the requirements of his NCPA claim set out in applicable precedent nor has he pleaded this claim to the standards set out in Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure. Consequently, Cal's and Leach's Motion to Dismiss is granted as to William's Third Claim for Relief in William's Counterclaim and Third-Party Complaint.

### 3. The Estoppel Claim

William's Fourth Claim for Relief is denominated "Estoppel." Filing 8 at 10. This claim is based on the following alleged promises by "Defendants":

> 41.    Defendants made promises to William, including that they could perform a complete restoration of the Pontiac in a timely fashion, they could increase the value of the Pontiac to well over $1,000,000 for under $550,000, the Pontiac restoration would be completed soon after an invoice was paid, and if William just pays another invoice, they would finish the Pontiac.

Filing 8 at 10 (¶ 46). William alleges that Defendants reasonably foresaw that he would rely on their promises and that he did indeed reasonably rely on them by hiring Cal, delivering the vehicle to Defendants, and paying them. Filing 8 at 10 (¶¶ 47–49). William then alleges,

> 50.    Defendants should be precluded from asserting, to William's disadvantage, positions and rights inconsistent with positions previously taken by Defendants.

> 51.    Defendants have not fulfilled their promises.

> 52.    The Pontiac is still not finished despite the passage of nine-years and over $1,612,571.72 paid to Defendants.

> 53.    The Pontiac has not increased in value by anything close to the amounts charged by Defendants.

> 54.    It would be unconscionable to allow Defendants to maintain a position inconsistent with one to which they acquiesced, or from which they accepted benefits.

Filing 8 at 11 (¶¶ 50–54).

> a.  The Parties' Arguments

The crux of Cal's and Leach's challenge to William's estoppel claim is that William "pleads equitable estoppel as an affirmative claim for relief when it is an affirmative defense." Filing 28 at 2, 13 (similar allegation). They argue that equitable estoppel is a "shield" rather than a claim for relief that can stand on its own. Filing 28 at 14. They point out that this claim does not seek damages but a bar on certain positions that they might take. Filing 28 at 14. Thus, while they acknowledge that William could assert an equitable estoppel defense as an affirmative defense, they argue that he cannot assert equitable estoppel as a free-standing claim. Filing 28 at 14.

William argues that Nebraska law recognizes promissory estoppel as a cause of action. Filing 31 at 10. He argues that such a claim is based upon a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promise, and which does in fact induce such action or forbearance. Filing 31 at 10. He argues that he has adequately alleged

such a claim, including the element of an injustice that would exist if Cal Creations and Leach are allowed to keep $1,612,571.72 despite their failure to fulfill their promises. Filing 31 at 11.

In reply, Cal and Leach argue that William has not pleaded a claim for promissory estoppel because the relief he requests mirrors the relief provided by equitable estoppel. Filing 32 at 7. Specifically, they argue that William has not pleaded the last element of promissory estoppel, which they frame as "injustice can only be avoided by enforcing the promise." Filing 32 at 8. They reiterate that William does not request damages on this claim but a bar on Cal and Leach asserting positions inconsistent with their promises. Filing 32 at 8. In the alternative, if the Court concludes that William has asserted a promissory estoppel claim, Cal and Leach argue that this claim should be dismissed at least as to Leach because the claim cannot be asserted against him in his individual capacity where he was acting as the agent of Cal. Filing 32 at 8–9.

     b.   Estoppel under Nebraska Law

Under Nebraska law, "[e]quitable estoppel generally bars a party from relief because of [the party's] prior actions." *Crow v. Nebraska Dep't of Revenue*, 3 N.W.3d 881, 892 (Neb. 2024) (citing *Berrington Corp. v. State*, 765 N.W.2d 448 (Neb. 2009)). In other words, the party raising equitable estoppel "seeks to estop the [opposing party] from achieving relief" because of the opposing party's conduct. *Id.* To put it more bluntly,

> Equitable estoppel is an affirmative defense. And when a party seeks to raise estoppel as an affirmative defense to a claim for relief, it must be affirmatively set forth in the party's responsive pleading.

*Bleich v. Bleich*, 981 N.W.2d 801, 809 (Neb. 2022).

The Nebraska Supreme Court explained,

> The elements of equitable estoppel are, as to the party estopped:
>
> (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party

38

> subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts.

[*Berrington Corp.*, 277 Neb.] at 774, 765 N.W.2d at 455.

> As to the other party, the elements are:

> (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice.

> *Id.*

*Crow*, 3 N.W.3d at 892; *see also Noah's Ark Processors, LLC v. UniFirst Corp.*, 970 N.W.2d 72, 79 (Neb. 2022) (stating these elements). The consequence of proof of an equitable estoppel defense is that "the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed." *Nelssen v. Ritchie*, 934 N.W.2d 377, 383 (Neb. 2019) (citing *Burns v. Nielsen*, 732 N.W.2d 640 (Neb. 2007)); *Brick Dev. v. CNBT II LLC*, 918 N.W.2d 824, 833 (Neb. 2018) ("The doctrine of equitable estoppel is applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he or she has acquiesced or of which he or she has accepted any benefit.").

In contrast, promissory estoppel is a claim for recovery of damages. *In re Est. of Ryan*, 925 N.W.2d 336, 343 (Neb. 2019). The Nebraska Supreme Court has explained,

> Recovery on a theory of promissory estoppel is based upon the principle that injustice can be avoided only by enforcement of a promise. Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

*In re Est. of Ryan*, 925 N.W.2d at 343; *Weitz Co., LLC v. Hands, Inc.*, 882 N.W.2d 659, 668 (2016) ("In Nebraska, a claim of promissory estoppel requires a plaintiff to show: (1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the

promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise."). The "main focus" is on the claimant's "reasonable reliance." *Id.* (explaining that because of this focus, "the doctrine of promissory estoppel does not require that the promise giving rise to the cause of action must meet the requirements of an offer that would ripen into a contract if accepted by the promise"). The relief available on a promissory estoppel claim is damages, although there is no single measure of damages that applies in every promissory estoppel case. *Weitz Co., LLC*, 882 N.W.2d at 672.

c.    William Has Not Pleaded a Promissory Estoppel Claim

Equitable estoppel and promissory estoppel under Nebraska law are distinguished—at the very least—by their purposes. Equitable estoppel is an affirmative defense raised by a party against whom a claim for relief is asserted to bar the opposing party from achieving relief. *Crow*, 3 N.W.3d at 892; *Bleich*, 981 N.W.2d at 809. Thus, the consequence of proving equitable estoppel is that "the acting party is absolutely precluded, both at law and in equity, from asserting rights which might have otherwise existed." *Nelssen*, 934 N.W.2d at 383. In other words, equitable estoppel applies "to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he or she acquiesced or of which he or she has accepted any benefit." *Brick Dev.*, 918 N.W.2d at 833. In contrast, promissory estoppel is a claim for recovery of damages, based upon the principle that injustice can be avoided only by enforcement of a promise. *In re Est. of Ryan*, 925 N.W.2d at 343; *Weitz*, 882 N.W.2d at 668.

What William plainly attempts to plead as a claim of promissory estoppel is a defense of equitable estoppel—*i.e.*, a defense to any claims by Cal and Leach to recover against him. He expressly pleads, "It would be unconscionable to allow Defendants to maintain a position inconsistent with one to which they acquiesced, or from which they accepted benefits." Filing 8 at 11 (¶ 54). This is an element of an equitable estoppel defense. *See Brick Dev.*, 918 N.W.2d at 833

40

("The doctrine of equitable estoppel is applied to transactions in which it is found that it would be unconscionable to permit a person to maintain a position inconsistent with one in which he or she acquiesced or of which he or she has accepted any benefit."). William also does not pray for any damages based on enforcement of a promise, *see* Filing 8 at 10–11 (¶¶ 46–54), even though he argues that he is asserting a promissory estoppel claim. *See In re Est. of Ryan*, 925 N.W.2d at 343 (explaining that promissory estoppel is a theory for recovery of damages); *Weitz Co., LLC.*, 882 N.W.2d at 672 (explaining that the relief available on a promissory estoppel claim is damages, although there is no single measure of damages that applies to every such claim).

The Court takes no position on whether or not William can assert an affirmative defense of equitable estoppel. The Court concludes only that William has not pleaded a claim for promissory estoppel that states a claim upon which relief can be granted. Cal's and Leach's Motion to Dismiss is granted as to William's Fourth Claim for Relief in William's Counterclaim and Third-Party Complaint.

### 4. The Unjust Enrichment Claim

The last counterclaim and third-party claim that Cal and Leach challenge is William's Fifth Claim for Relief denominated "Unjust Enrichment." This claim is briefly pleaded as follows:

> 56.    Defendants received $1,612,571.72 from William based upon promises and representations that the Pontiac would be completely restored, its value increased to well over $1,000,000, and that the Pontiac would be returned to William.

> 57.    Defendants have retained possession of the $1,612,571.72.

> 58.    In justice and fairness, Defendants ought to repay the $1,612,571.72 to William.

Filing 8 at 11 (¶¶ 56–58).

a. The Parties' Arguments

Cal and Leach expressly seek dismissal of this claim only as to Leach. Filing 27 at 1 (¶ D).
They argue that William attempts to assert an unjust enrichment claim against both of them, despite
asserting that he hired Cal, not Leach, to build the Pontiac. Filing 28 at 2. They point out that
William's allegations that both "Defendants" received and retained possession of the
$1,612,571.72 is contradicted by other allegations by William that he hired Cal to build the
Pontiac, the lack of any allegations that he hired Leach in addition to Cal, and the lack of any
allegations that he separately paid Cal and Leach for the same work. Filing 28 at 12. Cal and Leach
argue that one can infer from William's allegations that Leach was Cal's agent, that William makes
no allegations that Leach engaged in any conduct separate from Cal, and that William makes no
allegations that Leach benefited directly from any payments that William made to Cal. Filing 28
at 12–13. Finally, Cal and Leach argue that there is no basis for holding an agent liable for non-
tort obligations of a company. Filing 28 at 13.

William argues that unjust enrichment is a broad principle with few limitations. Filing 31
at 8–9. He argues that the language of his unjust enrichment claim is that "Defendants" (which
encompasses Leach) were paid and have retained money to which they are not entitled. Filing 31
at 9. He contends that at this stage the Court must accept as true his allegation that Leach received
and retained these payments. Filing 31 at 9. William also argues that Leach can be held liable for
his own fraud and torts. Filing 31 at 9.

Cal and Leach argue that even if William's assertion that a corporate officer can be held
personally liable for torts by the corporation is true, that assertion is inapplicable here. Filing 32 at
6. Instead, they argue that unjust enrichment is a quasi-contract claim not a tort claim. Filing 32 at
6. They assert further that the Court need not accept as true William's allegation that Leach
somehow jointly received payment from William because it is not reasonable to infer that an owner

42

and agent of Cal individually received payment for services performed by Cal for William. Filing 32 at 6–7.

      b.  Unjust Enrichment under Nebraska Law

The Nebraska Supreme Court has explained,

> An "implied-in-law contract," also known as a "quasi-contract," is not a contract. Quasi-contract claims are restitution claims to prevent unjust enrichment. Quasi-contractual obligations do not arise from an agreement; instead, the law imposes them when justice and equity require the defendant to disgorge a benefit that he or she has unjustifiably obtained at the plaintiff's expense. Thus, the defendant's liability arises under the law of restitution, not contract.

*Cnty. of Lancaster v. Cnty. of Custer*, 985 N.W.2d 612, 622 (Neb. 2023) (citations omitted); *see also 132 Ventures, LLC v. Active Spine Physical Therapy, LLC*, 982 N.W.2d 778, 786 (Neb. 2022) ("[A] claim for unjust enrichment is a quasi-contract claim for restitution."); *Schreiber Bros. Hog Co., LLC v. Schreiber*, 980 N.W.2d 890, 903 (Neb. 2022) ("Unjust enrichment claims do not arise from an express or implied agreement between the parties; rather, they are imposed by law 'when justice and equity require the defendant to disgorge a benefit that he or she has unjustifiably obtained at the plaintiff's expense.'" (quoting *Bloedorn Lumber Co. v. Nielson*, 915 N.W.2d 786, 792 (Neb. 2018))). More specifically, "[T]o recover on a claim for unjust enrichment, the plaintiff must show that (1) the defendant received money, (2) the defendant retained possession of the money, and (3) the defendant in justice and fairness ought to pay the money to the plaintiff." *Boone River, LLC v. Miles*, 994 N.W.2d 35, 895 (citing *Zook v. Zook*, 978 N.W.2d 156 (2022)), *opinion modified on other groundss on denial of reh'g*, 996 N.W.2d 629 (Neb. 2023)

In light of Leach's grounds for dismissal of this claim against him, the key issue is his relationship to Cal. In a case before the Nebraska Supreme Court, an individual defendant on an unjust enrichment claim cited cases in other jurisdictions for the proposition that unjust enrichment cannot be used to recover benefits obtained as an owner of a corporation unless the pleadings and

evidence warrant piercing the corporate veil. *First Express Servs. Grp., Inc. v. Easter*, 840 N.W.2d 465, 477 (Neb. 2013). The Nebraska Supreme Court stated,

> Our research reveals other cases which support that position. [The claimant] has not provided us with any cases to the contrary, and we have not found any. Instead, courts seem to allow unjust enrichment claims against a shareholder for benefits obtained from the corporation only where piercing the corporate veil is appropriate. Neither [the claimant's] pleadings nor the evidence in this case support piercing the corporate veil.

*First Express Servs. Grp., Inc.*, 840 N.W.2d at 477. The court held that where "[a]ny unjust benefit went to the corporation, not to [the defendant] individually, . . . [t]he fact that [the individual defendant] personally earned more money if his business earned more money is not sufficient to impose personal liability on [the individual defendant] for unjust enrichment." *Id.* at 478. Thus, the court held that the unjust enrichment claim against the individual defendant failed as a matter of law:

> [H]e did not receive a personal benefit, in that he acted in his corporate capacity and received benefits only because of his status as a shareholder. And because there is no allegation or apparent reason to pierce the corporate veil, he is protected. No claim for unjust enrichment will lie against [the individual defendant].

*First Express Servs. Grp., Inc.*, 840 N.W.2d at 478.

       c.  William Has Not Pleaded a Basis for Leach's Liability for Unjust Enrichment

At this point in the litigation, this case appears to be indistinguishable from *First Express Services Group*. The only plausible inferences from the allegations in the Counterclaim and Third-Party Complaint are that Leach is a shareholder or owner of Cal. *See* Filing 8 *passim*. Indeed, the Barbatos assert in their Notice of Removal that "[u]pon information and belief, Christopher A. Leach is the only member of Cal Creations." Filing 1 at 2 (¶ 5). William similarly identifies Leach in his brief in opposition to the motion to dismiss his counterclaims and third-party claims as "the owner of Cal Creations." Filing 31 at 2. Unjust enrichment cannot be used to recover benefits

44

obtained as an owner of a corporation unless the pleadings and evidence warrant piercing the corporate veil. *First Express Servs. Grp., Inc.*, 840 N.W.2d at 477. However, as in *First Express Services Group*, William has not provided the Court with any cases to the contrary, and the Court has not found any. *Id.* Furthermore, William's pleadings—the only facts the Court can properly consider on a Rule 12(b)(6) motion to dismiss—do not support piercing the corporate veil. *Id.* William's pleading that "Defendants" (which encompasses Leach) were paid and have retained money to which they are not entitled falls well short of a basis for piercing the corporate veil. Filing 31 at 9. Moreover, as a factual allegation, it is conclusory and speculative and therefore insufficient to state a claim. *Richardson*, 2 F.4th at 1068 ("Mere conclusory statements and factual allegations lacking enough specificity to raise a right to relief above the speculative level are insufficient to support a reasonable inference that the [opposing party] is liable." (internal quotation marks and citations omitted)).

The Court concludes that William has not pleaded a claim for unjust enrichment that states a claim against Leach upon which relief can be granted. The Motion to Dismiss William's Fifth Claim for Relief in William's Counterclaim and Third-Party Complaint as against Leach is granted.

## IV. CONCLUSION

Upon the foregoing,

IT IS ORDERED that:

1.     Angela Barbato's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, Filing 4, is granted, and the claims against her are dismissed;

2.      Cal's and Leach's "Partial Motion to Dismiss" [sic], Filing 27, is granted. Accordingly, the following Counterclaims and Third-Party by William Barbato are dismissed for failure to state claims upon which relief can be granted:

a.      William's Second Claim for Relief in William's Counterclaim and Third-Party Complaint alleging fraud and concealment is dismissed;

b.      William's Third Claim for Relief in William's Counterclaim and Third-Party Complaint alleging a violation of the Nebraska Consumer Protection Act (NCPA) is dismissed;

c.      William's Fourth Claim for Relief in William's Counterclaim and Third-Party Complaint alleging an estoppel claim is dismissed; and

d.      William's Fifth Claim for Relief in William's Counterclaim and Third-Party Complaint alleging unjust enrichment is dismissed as against Leach.

THEREFORE, this case will proceed on the claims in Cal's Complaint, Filing 1-1, and William's Counterclaim and Third-Party Claim for conversion against Cal and Leach and William's Counterclaim and Third-Party Claim for unjust enrichment against Cal.

Dated this 10th day of October, 2025.

BY THE COURT:

Brian C. Buescher
United States District Judge